**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | No.  CR-24-08083-001-PCT-SPL |
| | ) | |
| Plaintiff, | ) | **ORDER** |
| vs. | ) | |
| | ) | |
| Marian Marsha Josytewa, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Before the Court is Defendant's Motion to Suppress Blood Draw (Doc. 46), the Government's Response (Doc. 52), and Defendant's Reply (Doc. 68). Also before the Court is Defendant's Motion to Suppress Statement (Doc. 47) and the Government's Response (Doc. 53).[1] The Court conducted an evidentiary hearing and heard oral argument on the motions at the July 29, 2025 Final Pretrial Conference. For the following reasons, both motions will be denied.

## I.    BACKGROUND

This case arises out of a December 10, 2021 rollover car accident that occurred when Defendant was driving her two minor sons, "D.H.," 16, and "J.H.," 14, from school in Flagstaff back home to the Hopi Reservation. (Doc. 46 at 1–2; Doc. 52 at 1). The Government contends that Defendant was drunk driving, drifted off the road, overcorrected, and rolled her car, resulting in her unbuckled 14-year-old son being ejected

---

[1] Defendant did not file a Reply in support of her Motion to Suppress Statement.

from the car and instantly killed. (Doc. 52 at 1–2). On Defendant's account, an oncoming car drove into her lane, and in an attempt to avoid collision, she fell off the right shoulder of the road, resulting in the rollover accident that tragically killed J.H. (Doc. 46 at 2). Defendant disputes the Government's evidence of alcohol-related impairment. (*See id.* at 3). The pertinent timeline following the accident is as follows:

An anonymous male called 911 and reported the accident around 4:12 p.m. (Doc. 46 at 2–3). The first officer to arrive at the scene around 4:25 p.m., Sheriff's Deputy Daniel Flores, made no observations about alcohol. (*Id.* at 3). The primary crash investigator, Sergeant Ronald R. Bitah of the Navajo Department of Criminal Investigations, arrived about twenty minutes later. (*Id.*). He claims that Defendant told him she had been drinking alcoholic beverages last night and this morning, and he claimed that he smelled alcohol on her breath, but he made no other observations of impairment, and field sobriety testing was not conducted. (*Id.*). Ten minutes later, another Criminal Investigations Officer, Mylon Calamity, arrived to transport Defendant and D.H. to the Winslow police department to administer a breath test, but the test was ultimately unsuccessful. (*Id.* at 3–4). Officer Calamity also noted an odor of alcohol on Defendant. (*Id.* at 4). Because the Intoxilyzer in Winslow was inoperable, he then transported Defendant, D.H., and Defendant's mother and her husband, who had recently arrived, to the Navajo County substation to try to use their Intoxilyzer. (*Id.*). Subsequently, Defendant complained that she was feeling unwell, and she was transported to the Little Colorado Medical Center ("LCMC") by her mother and her mother's husband. (*Id.*). At the hospital, J.H. and D.H.'s father joined them. (*Id.* at 5). At 8:42 p.m., blood was drawn for LCMC's standard medical testing purposes. (*Id.*; Doc. 52 at 2). At the request of the FBI, Sergeant Ron Chisholm of the Navajo County Sherrif's Office arrived at LCMC and was present while Defendant received treatment. (Doc. 52 at 2). The Emergency Room Technician who drew Defendant's blood for LCMC, Ariel Oginski, then asked Sergeant Chisholm if he would like her to draw Defendant's blood for law enforcement purposes. (*Id.*). Sergeant Chisholm called FBI Special Agent ("SA") Brian McGrew, who told him to obtain her blood if Defendant provided her

consent. (*Id.* at 2–3). A consent form signed by Defendant indicates that her blood was drawn for law enforcement purposes at 8:45 p.m., but that she signed the consent form at 8:53 p.m., *after* the blood was drawn. (Doc. 46 at 5–6). At some point thereafter, Defendant gave a statement to Navajo Nation Criminal Investigator Donald Seimy and SA McGrew, of which Defendant has submitted an audio recording and transcript. (Doc. 46 at 7; Doc. 47-2). During the interview, Defendant stated, among other things, that (1) she went off the side of the road because another car was trying to pass, (2) that she did not think J.H. was wearing a seatbelt, (3) that she had a pint of Full Sail beer when they stopped for pizza before leaving Flagstaff, about an hour before the accident occurred, (4) that she estimated she was going about 60 miles per hour when the accident occurred, and (5) that there was a bottle of vodka and a 12-pack of beer in her vehicle. (Doc. 47 at 6).

## II.    DISCUSSION

### A.    Motion to Suppress Blood Draw

#### 1.    *Validity of Consent*

Defendant makes two arguments for suppression of the blood draw: (1) her consent was obtained after the fact, and therefore was not voluntary or valid, and (2) the blood test should be excluded under Federal Rule of Evidence 403 as unreliable and unduly prejudicial. (Doc. 46 at 8, 11).

A blood test is considered a search under the Fourth Amendment. *Schmerber v. California*, 384 U.S. 757, 767 (1966). Here, Defendant's blood draw would satisfy the Fourth Amendment if the Government can show she knowingly and voluntarily consented to it. *United States v. Holt*, No. CR06-148-C-EJL, 2007 WL 9719316, at *2 (D. Idaho Oct. 2, 2007), *aff'd*, 318 F. App'x 595 (9th Cir. 2009); *see also United States v. Reid*, 226 F.3d 1020, 1026 (9th Cir. 2000) ("To 'establish the validity of a consent to search, the government bears the heavy burden of demonstrating that the consent was freely and voluntarily given.'" (citation omitted)).

The voluntariness of consent must be determined based on the totality of the circumstances. *United States v. Taylor*, 60 F.4th 1233, 1243 (9th Cir. 2023), *cert. denied*,

144 S. Ct. 828 (2024) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)). The Ninth Circuit focuses on five non-exclusive factors when evaluating whether consent was given voluntarily: "(1) whether defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether *Miranda* warnings were given; (4) whether the defendant was notified that [she] had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained." *Id.* (internal citations omitted).

Contrary to Defendant's assertion, this Court finds that she was not in custody at the time her blood was drawn. Whether a person is in custody for *Miranda* purposes turns on whether there is a formal arrest or restraint on freedom of movement. *United States v. Crawford*, 372 F.3d 1048, 1059 (9th Cir. 2004); *see also United States v. Akpan*, No. 2:05-cr-00304-RCJ-RJJ, 2009 U.S. Dist. LEXIS 12656, at *45 (D. Nev. Feb. 12, 2009) ("Where the facts reflect an obvious effort on law enforcement's part to indirectly or implicitly restrict the suspect's freedom, such that a reasonable suspect would 'have felt he or she was not at liberty to terminate the interrogation and leave,' custody is properly found." (quoting *United States v. Craighead*, 539 F.3d 1073, 1088 (9th Cir. 2008)). "This inquiry requires a court to examine the totality of the circumstances from the perspective of a reasonable person in the suspect's position." *Crawford*, 372 F.3d at 1059. Factors influencing the Court's determination "include the language used by the officers, the physical characteristics of the place where the question occurs, the degree of pressure applied to detain the individual, the duration of the detention, and the extent to which the person was confronted with evidence of guilt." *United States v. Butler*, 249 F.3d 1094, 1099 (9th Cir. 2001).

Defendant was never placed under arrest—to the contrary, SA McGrew explicitly told her, "[Y]ou're not under arrest." (Doc. 47-2 at 2). There was never any meaningful restraint on Defendant's freedom of movement, as she had not been formally detained, nor did any person indicate that she legally could not leave the hospital. At the July 29 Evidentiary Hearing, SA McGrew reiterated that there were no restraints placed on Defendant's movement, no threats made to her, and no weapons drawn on her. (ME 91;

Draft Hr'g Tr. 35:16–36:23). There is no evidence to suggest that Defendant ever asked to leave, either. Defendant allowed SA McGrew and Investigator Seimy to enter her hospital room, she answered their questions, and she explicitly stated that she did not "want to, you know, hinder this investigation." (*Id.* at 20). Although Defendant's interview with SA McGrew and Investigator Seimy took place *after* the blood draw in question, her willingness to answer their questions and her statement that she did not want to hinder the investigation is nonetheless indicative of her general compliance with law enforcement while she was at the hospital.

The mere fact that Defendant was in the hospital does not establish that she was in custody. *Cf. United States v. Martin*, 781 F.2d 671, 673 (9th Cir. 1985) (suggesting that a criminal suspect might be considered "in custody" if "the police took a criminal suspect to the hospital from the scene of a crime, monitored the patient's stay, stationed themselves outside the door, arranged an extended treatment schedule with the doctors, or some combination of these"). Furthermore, despite Defendant's contention that she was in continuous custody from the accident until she was at LCMC, Defendant was driven to LCMC by her parents, not law enforcement, which clearly suggests some freedom of movement. (Doc. 46 at 4). In sum, this factor—whether Defendant was in custody—weighs against a finding that her consent was involuntary.

At no point did law enforcement draw their weapons at Defendant, and there was no need to give Defendant *Miranda* warnings because she was never subject to a custodial interrogation—she was never in custody. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *see also United States v. Ritter*, 752 F.2d 435, 439 (9th Cir. 1985) ("The absence of Miranda warnings is not, however, dispositive of whether an individual voluntarily consented to a search."). These two factors also weigh against involuntariness. Evidence also suggests that Defendant was informed she had a right not to consent to the blood draw—at the very least, the fact that she was asked for consent and signed the consent form implies that she knew she could have withheld consent. And other evidence in the record all points to the fact that Defendant was willingly complying with the law enforcement

investigation. (*See* Doc. 47-2 at 20). Furthermore, her other statements indicate that she was fully mentally capable of understanding the nature of her consent and her ability to withhold consent—for example, when later asked by the officers whether she would be willing to have a forensic interviewer speak to D.H., she stated that she was "not sure I'm comfortable with that" because of her son's mental health. (*Id.* at 19–20). Her ability to coherently decline the officers' request to speak to her son suggests that she would have been fully mentally and emotionally capable of declining the blood draw had she been inclined to do so. (*See also* Doc. 52 at 3 ("According to Ms. Oginski and Sergeant Chisholm, Josytewa appeared to understand and appreciate the nature of the consent form, and her decision to provide consent for the blood draw.")). Finally, Defendant was not told a search warrant could be obtained for her blood, which, under these circumstances, weighs in favor of voluntariness, as Defendant was not threatened or made to believe that refusing consent would be futile. *See United States v. Cormier*, 220 F.3d 1103, 1112 (9th Cir. 2000); *United States v. Shephard*, No. 21-50194, 2024 WL 2103288, at *2 (9th Cir. May 10, 2024), *cert. denied*, No. 24-6459, 2025 WL 1787757 (U.S. June 30, 2025).[2]

Furthermore, Defendant's emphasis on her vulnerable state of shock at the hospital does not overcome a finding that she voluntarily gave consent to the blood draw. Courts can consider a defendant's "reduced mental capacity" when considering voluntariness because it can render the defendant "more susceptible" to coercion. *United States v. Preston*, 751 F.3d 1008, 1020 (9th Cir. 2014). However, a statement will not be considered involuntary so long as it is "the product of a rational intellect and a free will." *United States v. Springfield*, 2023 U.S. App. LEXIS 16473, at *2 (9th Cir. June 29, 2023) (citations omitted)*; see also, e.g.*, *United States v. Davis*, 860 F. App'x 533, 534 (9th Cir. 2021)

---

[2] Defendant argues in her Reply that "the police at the scene [of the crash] threatened Ms. Josytewa that they would get a warrant if she did not provide a breath test as quickly as they wanted." (Doc. 68 at 5). However, there is no evidence that she was told they could get a warrant for her blood sample, that she was threatened, or that she was made to believe consent would be futile. Furthermore, as Defendant notes, she had already "agreed to a breath test," just as she had consented to the blood draw. (*Id.*). All the evidence in the record suggests that Defendant was wholly and voluntarily compliant with the law enforcement investigation, including both the breath test and the blood test.

(finding that even though the defendant "testified that he was high during the interview, no record evidence indicates his drug use made him particularly vulnerable to coercion"); *United States v. Coleman*, 208 F.3d 786, 791 (9th Cir. 2000) (finding that symptoms of heroin withdrawal did not render statements involuntary). Here, there is no reason to think that Defendant's state of emotional shock rendered her incapable of knowingly and voluntarily consenting to the blood draw; on the contrary, her responses during SA McGrew and Investigator Seimy's interview shortly after the blood draw took place were responsive, rational, and cogent. (*See generally* Doc. 47-2).

However, even if Defendant's consent was ultimately obtained, she argues that the consent was invalid if it was only obtained *after* the blood draw occurred. (Doc. 46 at 9). The issue here is that the time on the consent form next to Defendant's name is eight minutes after the time listed for the blood draw on that same form. (Doc. 46-2 at 1). The Emergency Room Technician who drew Defendant's blood, Ms. Oginski, indicated, however, that "she did not draw Josytewa's blood for law enforcement purposes until after she witnessed Josytewa sign the consent form and consent to the blood draw," and that her "custom and practice when drawing blood for law enforcement is to always ensure that the patient provided consent first." (Doc. 52 at 3, 7). Ms. Oginski testified to the same effect at the Evidentiary Hearing, and this Court found her testimony highly credible. (ME 91). During an FBI interview, Ms. Oginski also noted that if Defendant had declined the blood draw, that would have been indicated in her medical records, which it was not. (Doc. 68-1 at 4).

Even if the form had not been physically signed prior to the blood draw, that does not necessarily entail that Defendant did not consent. Fourth Amendment consent "can be express or implied," as long as it is "'unequivocal and specific.'" *United States v. Escobar*, 309 F. Supp. 3d 778, 784 (N.D. Cal. 2018) (quoting *United States v. Basher*, 629 F.3d 1161, 1167–68 (9th Cir. 2011)). Defendant very well could have given her oral consent before the blood draw, then memorialized that consent in writing when she signed the form afterward. There is no evidence that Defendant did not willingly comply with the second

blood draw or in any way expressed that she did not consent, and all other evidence in the record suggests that she would have been amenable to giving her blood to law enforcement: in fact, she explicitly stated that she did not "want to . . . hinder this investigation" shortly after the blood draw occurred. (Doc. 47-2 at 20). Finally, as the Government indicates, "there are many possible explanations for the difference in time-stamps *other* than the blood draw having occurred after consent was obtained," such as different clocks being used, or Sergeant Chisholm placing the time on the form only after he was handed the vial of blood, especially given that there is different handwriting on different sections of the form. (Doc. 52 at 8; Doc. 46-2). At the Evidentiary Hearing, Sergeant Chisholm credibly testified and corroborated Ms. Oginski's timeline of events, which supports this Court's finding that Defendant consented to her blood being drawn for law enforcement purposes *before* that blood draw occurred. (ME 91).

On the totality of the circumstances, there is no reason to think Defendant did not knowingly and voluntarily consent to her blood being drawn for law enforcement purposes. On the contrary, all the evidence shows that Defendant was willingly compliant with law enforcement investigations on the day of the accident.

### 2. *Rule 403*

Secondarily, Defendant argues that the blood test should be excluded under Federal Rule of Evidence 403 as unreliable and unduly prejudicial. Both the Government and Defense intend to introduce expert toxicology witnesses to opine on the blood test and Defendant's estimated blood alcohol concentration ("BAC") at the time of the accident. (Docs. 40, 41, 42). The results of the blood test are directly probative of whether Defendant was intoxicated at the time of the accident, and therefore whether she acted with reckless disregard for human life, which is one of the elements of Involuntary Manslaughter that the Government must prove at trial. The Court does not find that the probative value of this evidence is substantially outweighed by a risk of undue prejudice or any of the other Rule 403 factors. To the extent Defendant wishes to attack the reliability of the blood test, she may do so through cross-examination of the Government's expert witnesses and through

the testimony of her own expert toxicology witness.

The Motion to Suppress Blood Draw will therefore be denied.

### 3.    *Inevitable Discovery*

In the alternative, the Government argues that even if Defendant "had denied law enforcement consent to draw her blood, SA McGrew would have obtained a search warrant for a blood draw that same evening," as the alleged smell of alcohol on Defendant and her statements that she drank alcohol that day gave SA McGrew probable cause to obtain a warrant. (Doc. 52 at 8–9). The Government therefore argues that "a preponderance of the evidence demonstrates that the blood draw would have been inevitably obtained through lawful means." (*Id.* at 9).

The inevitable discovery doctrine asks whether evidence obtained in an illegal search would have inevitably been discovered through lawful means. *See Nix v. Williams*, 467 U.S. 431, 447 (1984) ("[I]f the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police, there is no rational basis to keep that evidence from the jury in order to ensure the fairness of the trial proceedings."). However, this exception "does not apply when officers have probable cause to apply for a warrant but simply fail to do so." *United States v. Lundin*, 817 F.3d 1151, 1161 (9th Cir. 2016); *United States v. Mejia*, 69 F.3d 309, 320 (9th Cir. 1995) ("To apply the inevitable discovery doctrine whenever the police could have obtained a warrant but chose not to would in effect eliminate the warrant requirement.").

 "The inevitable discovery doctrine applies only when the fact that makes discovery inevitable is born of circumstances other than those brought to light by the illegal search itself." *United States v. Reilly*, 224 F.3d 986, 995 (9th Cir. 2000). In *United States v. Martinez-Gallegos*, 807 F.2d 868 (9th Cir. 1987) (per curiam), for example, the defendant was incarcerated following a traffic violation and was asked whether he was a United States citizen. When he admitted that he was not, INS agents were notified, and without giving him a *Miranda* warning, they asked him for his name and background information. *Id.* at

869. The agents used his name and background information to consult his file and determine that he had been deported two times. *Id.* The defendant sought to suppress the contents of that file as the illegal fruit of his statements to the agents. *Id.* at 870. The court denied the motion, finding that if the defendant had refused to answer the agents' questions, the next and only step available to the agents would have been to consult his file. *See id.* ("The agents testified at the suppression hearing that if Martinez-Gallegos had refused to answer the agents' questions pertaining to his identity and background, the agents' next step, indeed the only step available to them, would have been to consult his 'A' file. The file was readily retrievable since county officials had obtained Martinez-Gallegos' true name during the booking procedure."). The Court therefore held that the doctrine of inevitably discovery applied, and it declined to exclude the evidence. *Id.*

Also illustrative of the inevitable discovery doctrine is *United States v. Brown*, 328 F.3d 352 (7th Cir. 2003), where law enforcement agents began to search an apartment after obtaining written consent from the apartment leaseholder, who did not live at the apartment, but only leased it to the defendant. Ultimately, this consent was found to be invalid, as the leaseholder did not possess common authority over the premises. *Id.* at 356. However, the Seventh Circuit found that the evidence seized from the apartment during that unlawful search was nonetheless properly admitted under the inevitable discovery doctrine:

> Brown argues that the district court erred in applying the inevitable discovery doctrine because but for finding the drugs and money seized, the agents would not have sought a warrant. We disagree. This is not a case in which the government simply disregarded Brown's constitutional rights and blindly searched his apartment. The record indicates that the agents went to Brown's residence with the purpose of arresting him on outstanding state warrants, and after arresting him, contacted the U.S. Attorney's office to seek guidance on how to proceed with a search of the apartment. It was only at the direction of an AUSA that the agents sought and secured [the leaseholder's] consent to search the apartment.
>
> We have no doubt that if there had been no [leaseholder] from whom to obtain consent, or if the AUSA had known of the defect in the consent . . . , the AUSA would have instructed the marshals to obtain a search warrant before beginning the

10

search.

> The exclusionary rule is a sanction that is supposed to be proportioned to the wrongdoing that it punishes; the rule should not be used to make the person whose rights have been violated better off than he would be if no violation had occurred. We have found that the law enforcement agents were not justified in searching Brown's apartment . . ., [but] the agents had more than enough information, without the evidence uncovered during the invalid consent search, to obtain a warrant. The only mistake these agents made was driving to [the leaseholder's] place of employment to secure his consent rather than driving to the courthouse to obtain a warrant.

*Id.* at 357 (citation omitted).

The Government focuses its argument on whether SA McGrew *could* have obtained a search warrant—and this Court agrees that, based on the observable evidence of her intoxication, and Defendant's own admission that she had been drinking, there was probable cause to obtain such a warrant. (*See* Doc. 52 at 9). But the relevant question, for purposes of the inevitable discovery doctrine, is whether, had Defendant refused to consent to the blood draw, SA McGrew inevitably *would* have obtained a search warrant—not merely whether he *could* have. *See United States v. Souza*, 223 F.3d 1197, 1204 (10th Cir. 2000) ("The key issue in [inevitable discovery doctrine] cases, one of probability, is how likely it is that a warrant would have been issued and that the evidence would have been found pursuant to the warrant. . . . In those cases where, although police had announced an intent to secure a warrant, courts have declined to apply the inevitable discovery exception, the reason was that, after weighing the probability of obtaining a warrant and the probability that the evidence would have been discovered pursuant to the warrant, the contingencies involved were too uncertain to justify application of the doctrine."). Here, the record indicates that SA McGrew indeed would have obtained such a warrant. *See United States v. Gomez*, 990 F.2d 1262 (9th Cir. 1993) (applying the inevitable discovery doctrine where "[t]here's no doubt the officers intended to seek a warrant had Gomez withheld consent."). In fact, he explicitly testified at the Evidentiary Hearing that if Defendant had withheld her consent, he would have obtained a search warrant, as he had

11

done in hundreds of previous cases. (ME 91; Draft Hr'g Tr. 38:17–24). Unlike other cases where the inevitable discovery doctrine was found not to apply because the police "simply failed" or "chose not" to obtain a warrant, here, law enforcement did not seek a warrant because it genuinely and reasonably believed it did not need to obtain one, because it believed Defendant had consented. *See United States v. Cano*, No. 19-50240, 2021 WL 3878652, at *1 (9th Cir. Aug. 31, 2021) (distinguishing inevitable discovery case where "there were no facts in the record from which the district court could reasonably infer the likely course of the future investigation absent the illegal search" from the instant case where there was "evidence of the officer's active pursuit of legally-obtained leads"). In other words, this is not a case where the Government is attempting to excuse law enforcement's wrongful failure to obtain a warrant. *Cf. United States v. Young*, 573 F.3d 711, 723 (9th Cir. 2009). Even *if* Defendant's consent was invalid—and this Court finds otherwise—there is no wrongdoing by law enforcement that ought to be punished by excluding the results of the blood draw. *See Brown*, 328 F.3d at 357.

Therefore, while not dispositive of this Court's decision to deny the Motion to Suppress Blood Draw, the Government's inevitable discovery argument does provide further support for admitting the evidence.

## B.    Motion to Suppress Statement

In her second Motion to Suppress (Doc. 47), Defendant argues that the statement she gave to SA McGrew and Investigator Seimy at the hospital should be suppressed under the Fourth and Fifth Amendments. (Doc. 47 at 1). Defendant argues that she was in custody and therefore entitled to a *Miranda* warning before being questioned. (*Id.* at 6).

For the same reasons discussed with respect to the previous motion to suppress, this Court finds that under the totality of the circumstances from the perspective of a reasonable person in Defendant's position, she was not in custody for purposes of *Miranda* at the time the statement was made, or at any point while she was at the hospital. *See United States v. Norris*, 428 F.3d 907, 912 (9th Cir. 2005). Because Defendant was not in custody when she was questioned, admission of the hospital statements does not run afoul of Defendant's

*Miranda* rights. *See Miranda*, 384 U.S. at 478 ("Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence . . . . Volunteered statements of any kind are not barred by the Fifth Amendment . . . ."). On that basis, Defendant's Motion must be denied.

The fact that Defendant was in "an extremely vulnerable state" at the time the statements were made does nothing to change this Court's finding that the statements were voluntarily given and that Defendant was not in custody at the time they were made. *See, e.g.*, *Springfield*, 2023 U.S. App. LEXIS 16473, at *2 (finding the defendant's statement voluntary where he "answered the agents' questions in a reasonably lucid, responsive manner and the agents' conduct was not coercive, threatening, or otherwise improper." (citation omitted)).

Accordingly,

**IT IS ORDERED** that the Motion to Suppress Blood Draw (Doc. 46) is **denied**.

**IT IS FURTHER ORDERED** that the Motion to Suppress Statement (Doc. 47) is **denied**.

Dated this 30th day of July, 2025.

Honorable Steven P. Logan
United States District Judge